**HARSHMAN II DEVELOPMENT CO., L.L.C., Appellant,**

v.

**MEIJER STORES LIMITED PARTNERSHIP, Appellee.**

[Cite as *Harshman II Dev. Co., L.L.C. v. Meijer Stores Ltd. Partnership,* 189 Ohio App.3d 249, 2010-Ohio-381.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 23355.

Decided Feb. 5, 2010.

250

Neil F. Freund and Adam C. Armstrong, for appellant.

Michael H. Carpenter and Katheryn M. Lloyd, for appellee.

DONOVAN, Presiding Judge.

{¶ 1} Plaintiff-appellant Harshman II Development Co., L.L.C., appeals a decision of the Montgomery Court of Common Pleas, General Division, in which the trial court sustained the motion for summary judgment of defendant-appellee Meijer Stores Limited Partnership ("Meijer"). The trial court filed its written decision on March 20, 2009. Harshman II filed a timely notice of appeal with this court on March 27, 2009.

I

{¶ 2} The instant appeal arises from the sale and purchase of a 19.23–acre parcel of commercial real estate located in the 2700 block of Harshman Road in

Dayton, Ohio ("the property"), between Meijer, the seller, and Harshman II, the buyer. Meijer originally purchased the property in 1992 in order to build a wholesale store. Meijer hired consultants to inspect and evaluate the property regarding existing environmental issues that may have affected the property's development. As a result of the inspections of the property, Meijer received the following three pertinent reports and assessments: (1) the June 29, 1992 letter from Woolpert Consultants regarding the discovery of wetlands on the property ("the Woolpert Report"), (2) the October 1992 Phase I Environmental Site Assessment of the property ("the Phase I"), and (3) the November 11, 1992 Phase II Environmental Site Assessment of the property ("the Phase II").

{¶ 3} The Woolpert Report identified five isolated wetland areas located on the property, which amounted to a total of approximately 0.293 acres of the total land area of the property in 1992. The Woolpert Report also stated that "given that the total wetlands on the site amount to .3 acre, discharge of fill in these areas would be permissible under [nationwide permit No. 26] with no notification of the Army Corp. required." Meijer, however, ultimately decided to abandon its plans to build the store, and the property was never developed.

{¶ 4} In July 1994, Meijer hired Marvin Marcus, a former commercial real estate realtor/broker, to list the property for sale. As a promotional tool to aid in the sale of the property, Meijer drafted a Site Evaluation Information Sheet ("the Spec. Sheet"), which listed the Woolpert Report, Phase I, and Phase II in regards to assessments that had been performed on the property. While it listed the documents, neither the Woolpert Report, the Phase I, nor the Phase II were attached to the Spec. Sheet. Marcus stated in his deposition testimony that he had never seen a copy of the Woolpert Report or any of the other assessments while attempting to sell the property for Meijer. Marcus also stated that he was unaware that wetlands existed on the property. Nevertheless, Marcus was unable to sell the property at that time.

{¶ 5} The record establishes that in March 2004, Ohio Environmental Protection Agency ("EPA") employee Joseph E. Bartoszek contacted Greg Heath, Meijer's real estate manager, in order to ask for permission to enter the property and investigate a specific type of salamander that Bartoszek believed lived on the property. According to Bartoszek, between March and June 2004, approximately eight EPA employees accessed the property to study the habitat. As a result of the study, the Ohio EPA drafted a report in which it determined that the property contained three Category 3 wetland areas.[1] The EPA, however, did not

---

1. Pursuant to the Ohio Administrative Code, Category 3 wetlands are the most protected type of wetlands and can be disturbed only upon a showing of "demonstrated public need." Ohio

report its findings or the classification of the property to Meijer. The report was also not made available to the public.

{¶ 6} In 2005, Harshman II decided to purchase the property. To this end, Harshman II hired Marcus as its representative in the commercial transaction. On September 30, 2005, Harshman II and Meijer entered into a real estate option contract regarding the intended sale of the of the property to Harshman II. The option contract specified that Meijer was selling the property in an "as is" condition and that Meijer was not making any representations in regards to the property. The contract also provided Harshman II with the right to inspect the property at its own expense.

{¶ 7} During its period of inspection, Harshman II hired ERAtech, Inc. to conduct a Phase I Environmental Report, which disclosed the existence of low-lying wet areas on the property; however, ERAtech's investigation of the property failed to disclose the existence of any jurisdictional wetlands.[2] Harshman II also made repeated requests to Meijer for "all environmental reports pertaining to [the] property." On October 19, 2005, Meijer forwarded Harshman II a copy of its 1992 Phase I report.[3] Meijer provided its Phase II environmental report shortly thereafter. The cover letter attached to the forwarded Phase I report specifically stated, "[P]lease note that neither Meijer nor its consultant make any representations or warranties to you or your firm concerning the accuracy or completeness of the enclosed report, and you should independently verify the information to your own satisfaction." It is undisputed that Meijer did not provide a copy of the Woolpert Report to Harshman II prior to the sale of the property, and Meijer's Phase I and II reports did not identify the existence of jurisdictional wetlands on the property.

{¶ 8} After its period of inspection ended, Harshman II purchased the property from Meijer on January 6, 2006, for approximately $1.470 million. Harshman II immediately began clearing the property and filling in the wet areas. Shortly thereafter, the Ohio EPA was informed of Harshman II's activities on the

Adm.Code 3745-1-54(D)(1)(c)(iii). "Public need" is defined as "an activity or project that provides important tangible and intangible gains to society, that satisfies the expressed or observed needs of the public where accrued benefits significantly outweigh reasonably foreseeable detriments." Ohio Adm.Code 3745-1-50(II).

2. Harshman II also sued ERAtech for its failure to detect the existence of the jurisdictional wetlands on the property. As of the date of the instant appeal, Harshman II and ERAtech were engaged in arbitration in order to determine ERAtech's liability.

3. We note that the 1992 Phase I report specifically mentions the existence of "wetland plant species" in the low-lying wet areas present on the property when it was originally purchased by Meijer.

property. Construction on the property was halted, and Harshman II was charged with affecting jurisdictional wetlands without a permit.

{¶ 9} Harshman II subsequently brought suit against Meijer, alleging fraud and breach of contract. Harshman II argued that the existence of the jurisdictional wetlands was a latent defect in the property that Meijer had failed to disclose by intentionally withholding production of the Woolpert Report. On December 8, 2008, Meijer filed its motion for summary judgment regarding Harshman II's claims. Harshman II filed a memorandum in opposition on December 22, 2008. The court also heard oral argument from the parties on March 2, 2009. On March 20, 2009, the trial court sustained Meijer's motion for summary judgment in its entirety.

{¶ 10} It is from this judgment that Harshman II now appeals.

## II

### Standard of Review

{¶ 11} An appellate court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241. We apply the same standard as the trial court, viewing the facts in the case in a light most favorable to the nonmoving party and resolving any doubt in favor of the nonmoving party. *Viock v. Stowe–Woodward Co.* (1983), 13 Ohio App.3d 7, 12, 13 OBR 8, 467 N.E.2d 1378.

{¶ 12} Pursuant to Civ.R. 56(C), summary judgment is proper if:

{¶ 13} "(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327 4 O.O.3d 466, 364 N.E.2d 267. To prevail on a motion for summary judgment, the party moving for summary judgment must be able to point to evidentiary materials that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264. The nonmoving party must then present evidence that some issue of material fact remains for the trial court to resolve. Id.

## III

{¶ 14} Harshman II's first assignment of error is as follows:

{¶ 15} "The trial court erred in grating summary judgment in favor of appellee on Harshman II's fraud claim."

{¶ 16} In its first assignment, Harshman II contends that the trial court erred when it sustained Meijer's motion for summary judgment with respect to Harshman II's claim for fraud. Specifically, Harshman II argues that the trial court erred when it found that the jurisdictional wetlands located on the property were not latent defects. Rather, the trial court found that the wetlands were an open and obvious condition and therefore capable of being detected upon reasonable inspection. The trial court additionally found that the evidence established that Meijer did not fraudulently withhold the Woolpert Report/wetlands assessment from Harshman II.

{¶ 17} The doctrine of caveat emptor applies to real estate transactions. In *Layman v. Binns* (1988), 35 Ohio St.3d 176, 178–179, 519 N.E.2d 642, the Ohio Supreme Court stated the following:

{¶ 18} "The doctrine of caveat emptor precludes recovery in an action by the purchaser for a structural defect in real estate where (1) the condition complained of is open to observation or discoverable upon reasonable inspection, (2) the purchaser had the unimpeded opportunity to examine the premises, and (3) there is no fraud on the part of the vendor."

{¶ 19} Caveat emptor will not bar recovery by a purchaser when latent defects that are not easily discoverable are coupled with affirmative misrepresentations or concealment. *Jacobs v. Racevskis* (1995), 105 Ohio App.3d 1, 5, 663 N.E.2d 653.

{¶ 20} In order to establish fraud, one must prove the following: (1) a representation or, where there is a duty to disclose, concealment of a fact (2) that is material to the transaction at hand (3) made falsely with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying on it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance. *Langford v. Sloan,* 162 Ohio App.3d 263, 2005-Ohio-3735, 833 N.E.2d 331, ¶ 10, citing *Gaines v. Preterm–Cleveland, Inc.* (1987), 33 Ohio St.3d 54, 55, 514 N.E.2d 709.

{¶ 21} Essentially, Harshman II contends that Meijer's failure to produce the Woolpert Report, which disclosed the existence of jurisdictional wetlands on the property, was an intentional concealment that amounted to fraud. Harshman II argues that when it requested production of all of the environmental reports that Meijer had amassed regarding the property, Meijer had a duty to turn over the Woolpert Report in addition to the Phase I and II reports. Harshman II asserts

that had it been made aware of the presence of wetlands, it would not have purchased the property from Meijer.

{¶ 22} "Factors to be considered in determining whether reliance is reasonable include 'the nature of the transaction, the form and materiality of the representation, the relationship of the parties, the respective intelligence, experience, age and mental and physical condition of the parties, and their respective knowledge and means of knowledge.' An individual 'has no right to rely on misrepresentations when the true facts are equally open to both parties.'" *Freedom Foods, Inc. v. Rose Valley Land Group, Ltd.* (July 20, 2006), S.D. Ohio No. c–1–04–690, 2006 WL 2045887, *5, quoting *Columbia Gas Transm. Corp. v. Ogle* (S.D.Ohio 1997), 51 F.Supp.2d 866.

{¶ 23} It should be noted that Marcus, in his representative capacity for Harshman II, sent a letter, dated August 16, 2005, to Meijer wherein he acknowledged "the possibility of a *wet land* issue" on the property. While admitting that it was aware that the property contained wet areas at various times during the year, Harshman II argues that the statement in Marcus's letter to Meijer does not establish that it was aware that the property contained jurisdictional wetlands that severely limited the use of the property. While the statement in Marcus's letter to Meijer raises some issues regarding whether Harshman II was aware of the existence of wetlands on the property, viewed in the light most favorable to the nonmovant, we must construe the facts in favor of Harshman II's interpretation. We, however, cannot ignore the fact that Harshman II is composed of experienced, knowledgeable, and sophisticated commercial real estate lawyers and developers.

{¶ 24} As previously stated, the doctrine of caveat emptor acts as a bar to recovery for the purchaser when the defect complained of is open to observation or discoverable upon reasonable inspection, the purchaser had an unimpeded opportunity to examine the premises, and the seller of the property does not engage in fraud. In the instant case, it is apparent from the record that Harshman II was aware that the property contained several wet areas. Harshman II even attempted to use the presence of the wet areas on the property in order to negotiate a lower purchase price. Upon a reasonable inspection of the property, Harshman II could have easily discovered the presence of the jurisdictional wetlands before it purchased the property. We note that the National Wetlands Inventory Map, a document accessible to the public, reveals the existence of jurisdictional wetlands on the property. In fact, the National Wetlands Inventory Map was used by a consultant Harshman II hired after development was halted on the property by the EPA to confirm the presence of wetlands. Simply put, had Harshman II conducted a wetlands assessment

during the period of inspection prior to the purchase of the property, the presence of the wetlands was readily discoverable.

{¶ 25} It is also undisputed that Harshman II had an unimpeded opportunity to inspect the property prior to its purchase. The record reflects that Harshman II even requested an extension on its period of inspection from Meijer for additional investigation, which was subsequently permitted. During its period of inspection, Harshman II also hired a consulting firm, ERAtech, in order to potentially discover any environmental issues that might affect the use of the property. ERAtech's report noted the existence of wet areas on the property, but Harshman II apparently never followed up on those findings.

{¶ 26} The sole question before us is, in the context of summary judgment, whether, on the instant record, there exists a genuine issue of material fact regarding whether Meijer fraudulently concealed the presence of jurisdictional wetlands from Harshman II by withholding the Woolpert Report. In regards to the document itself, the Woolpert Report was drafted in 1992 at the behest of Beerman Realty Company, which was facilitating the original sale of the property to Meijer. At the time that the report was created, laws regarding the development of commercial property with wetlands present were not particularly restrictive. This point is highlighted by Woolpert in the conclusion of the report wherein it states, "[G]iven that the total wetlands on the site amount to .3 acre, discharge of fill in these areas would be permissible under [nationwide permit No. 26] with no notification of the Army Corp. required." Thus, the presence of the wetlands, as identified by the Woolpert Report, was of little or no consequence to Meijer's originally planned development of the property.

{¶ 27} It should also be noted that two employees from Meijer's environmental compliance section for real estate acquisitions, Frank Remsburg and Lyle Livasy, both testified that the wetlands assessment performed on the property in 1992 would have absolutely no relevance in regards to the presence of wetlands on the property when Harshman II purchased it in 2006. In fact, both Remsburg and Livasy testified that a wetlands assessment would become obsolete after one or two years, thus requiring a fresh assessment of the wetlands on the property. Specifically, Remsburg testified that wetlands could become larger, smaller, or disappear altogether in a relatively short span of time, and a current assessment should always be performed in order to determine the effect of the wetlands on the development capability of the property. In the instant case, the size of the wetlands in 1992 was only .3 of the 19.23 acres of property. In 2006, the wetlands assessment performed revealed that the size of the wetlands had grown to take up approximately .82 acres of the 19.23 acre property. More importantly, it was not until 2001 that the Ohio EPA enacted regulations that severely restricted the development of property with wetlands present. Simply put, withholding the

Woolpert Report wetlands assessment created in 1992 would not be material to the purchase of the property in 2006 sufficient to demonstrate fraud as found by the trial court.

{¶ 28} We also note that the record fails to establish that Meijer intentionally concealed the Woolpert Report from Harshman II. Remsburg and Livasy both testified that they considered a wetlands assessment to be a separate and distinct inquiry from the Phase I and II environmental reports. When Livasy sent Harshman II the Phase I and Phase II environmental reports pursuant to its request, he testified that those documents were all he thought he was being asked to send. Remsburg further testified that it was only after Harshman II's development of the property had been halted for incursion into the wetlands that he became aware that the Woolpert Report even existed. Additionally, Harshman II has failed to establish a genuine issue of fact regarding whether Meijer was aware that the Ohio EPA had designated the site a Category 3 wetland. The record establishes that the Ohio EPA did not share the results of its 2004–2005 wetlands assessment with Meijer or anyone else.

{¶ 29} In light of the foregoing analysis, we find that Harshman II failed to establish that Meijer fraudulently concealed the existence of the wetlands on the property by failing to provide Harshman II with the Woolpert Report. Additionally, we hold that the presence of jurisdictional wetlands on the property was an open and obvious condition that Harshman II could have discovered upon reasonable inspection. Harshman II had unimpeded access to the property during its period of inspection and due diligence under the "as-is" real estate option contract with Meijer. Thus, the trial court did not err when it sustained Meijer's motion for summary judgment in regards to Harshman II's claim for fraud.

{¶ 30} Harshman II's first assignment of error is overruled.

IV

{¶ 31} Because they are interrelated, Harshman II's second, third, and fourth assignments of error will be discussed together as follows:

{¶ 32} "The trial court erred by granting summary judgment in favor of appellee on Harshman II's breach of contract claim."

{¶ 33} "The trial court erred by granting summary judgment in favor of appellee on Harshman II's negligent misrepresentation claim."

{¶ 34} "The trial court erred by granting summary judgment in favor of appellee on Harshman II's punitive damages claim."

{¶ 35} In its second assignment, Harshman II argues that the trial court erred in sustaining Meijer's motion for summary judgment in regards to Harshman II's claim for breach of contract. Specifically, Harshman II contends that a genuine issue of material fact existed as to whether Meijer fraudulently concealed the existence of the Woolpert Report, "and in turn, whether the fraudulent concealment negated the as-is clause in the option contract." In its third assignment, Harshman II contends that the trial court erred in granting Meijer's motion in regards to Harshman II's claim for negligent misrepresentation because Meijer falsely and recklessly misrepresented the "true facts concerning the Property's environmental condition."

{¶ 36} As we previously held in our analysis of the first assignment, there is no evidence in the record that establishes that Meijer knowingly or recklessly concealed the Woolpert Report in order to induce Harshman II to purchase the property. Thus, Harshman II's second and third assignments of error are rendered moot, and we need not further address the arguments contained therein.

{¶ 37} Since we have found that the trial court did not err when it sustained Meijer's motion for summary judgment regarding all of Harshman II's underlying claims for relief, the court clearly did not err when it held that the remaining claim for punitive damages must fail as a matter of law.

V

{¶ 38} All of Harshman II's assignments of error having been overruled or rendered moot, the judgment of the trial court is affirmed.

Judgment affirmed.

BROGAN and GRADY, JJ., concur.